**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Yasmin ALLIBHAI and Sultan Allibhai,**
**Defendants–Appellants.**

**No. 90–1354.**

United States Court of Appeals,
Fifth Circuit.

Aug. 6, 1991.

---

Roy L. Merrill, Dallas, Tex., for Yasmin Allibhai.

J. Ronald Sim and Lynn M. Reilly, Stoel Rives Boley, Seattle, Wash., for Sultan Allibhai.

Mervyn Hamburg, Appellate Section, Crim. Div., Dept. of Justice, Washington, D.C. and Marvin Collins, U.S. Atty., Dallas, Tex., for the U.S.

Before SMITH and DUHÉ, Circuit Judges, and POLOZOLA, District Judge.*

DUHÉ, Circuit Judge:

Raising a variety of complaints, appellants Yasmin and Sultan Allibhai challenge

* District judge of the Middle District of Louisiana, sitting by designation.

their convictions and sentences for money laundering. They argue that the government unjustifiably targeted them in its sting operation, that the district court improperly instructed the jury on the entrapment defense, and that the court erred in excluding the testimony of their expert witness. The appellants also argue that the district court improperly applied the sentencing guidelines, contending that the court based its sentencing decisions on irrelevant or erroneous factual findings. Finding no error, we affirm.

### Facts and District Court Proceedings

Acting on a tip from the Customs Service that Nizamudin Allibhai had been illegally transferring large sums of cash out of the United States, agents initiated an investigation of suspected money laundering activities in the Dallas area. Their information led them to a Dallas bank, where Nizamudin and the appellant Sultan Allibhai purportedly maintained accounts. Although agents confirmed Nizamudin and Sultan were not related, the appellant was nonetheless targeted by the government in its investigation.

In order to gain access to Sultan and other suspected money launderers, the government enlisted the cooperation of Al Hassam, a former Dallas resident who was, like Sultan and others on the government's list of suspects, an Ismaili Muslim.[1] The agents contacted Hassam, presented him with a list of primarily Ismaili names, and asked him if he recognized any of those listed. Hassam indicated that Sultan was a childhood schoolmate, but he professed he was unaware of his involvement in any illegal activities.

The agents decided that Hassam would pose as an insurance agent interested in exporting large sums of honest or ill-gotten gains out the United States for clients. Hassam contacted Sultan in Dallas, renewed their acquaintance, and invited him and his wife Yasmin to meet him at his hotel. At that meeting, Hassam indicated that he was looking for a money launderer and asked Sultan for a recommendation. Sultan advised Hassam that he need look no further, as he had previously engaged in such activities in Africa.

Hassam and Sultan eventually agreed on the details of their business arrangement: money skimmed from the proceeds of legitimate businesses or derived from illicit drug trafficking would be transported out of the country by Sultan. For his efforts, Sultan would receive a "handling fee" equivalent to two and one-half percent of the sums laundered. Other details regarding their first transaction were left unresolved, and Hassam returned to his home in Virginia.

Over the next three months, Sultan and Yasmin cooperated with Hassam in completing several transfers of money out of the United States. Typically, Hassam would meet Sultan at an appointed location, deliver to him a large sum of money in either large bills or cashier's checks, and provide Sultan with information as to where the money should be delivered. Sultan would carry the cash out of the country, neglecting to declare it on the U.S. Customs forms that require disclosure of cash sums in excess of $10,000. After arriving in Brussels or Toronto, Sultan would deposit the money into an account in a specified bank. Later, he would cause the money to be transferred via wire to bank accounts in the United States established and maintained for the purposes of such sting operations.

Throughout this time, Yasmin assisted Sultan in these activities by relaying messages to him from Hassam, or occasionally accepting cash deliveries from Hassam in her husband's stead. On at least one occasion, Yasmin made the actual delivery of the money to Brussels.

Later, the government substituted undercover agent Ralph Jacoby for Hassam as

---

1. The appellants make much of their affiliation with the Ismaili Muslim community, a small subsect of the Shi'ite Muslim faith. As a leader in the Dallas Ismaili community, Sultan collected the sums the Ismaili faithful were obliged to tithe to the Aga Khan, sending the money out of the United States. Sultan suggests that these legitimate activities first aroused the suspicions of government agents.

Sultan's contact. Jacoby represented to Sultan that he needed very large sums derived from illegal drug operations exported out of the country. Jacoby and Sultan agreed to do business on terms similar to those arranged with Hassam, with Sultan expressing interest in trafficking even larger sums than before. For the next several months, Sultan and Yasmin continued transporting money out of the country, frequently enlisting the aid of two co-defendants not parties to this appeal.

By the year's end, the government felt it had sufficient evidence to bring Sultan, Yasmin, and the two co-defendants to trial. It therefore suspended the sting operation for approximately six months. The government later reactivated the scheme, hoping to ferret out additional members of Sultan's organization. With renewed interest, Sultan and Yasmin revived their laundering activities, dealing with Agent Jacoby as before. By the time of their arrest, the players had laundered over $1.5 million dollars, for which the Allibhais received over $76,000 in commissions.

Sultan, Yasmin, and two co-defendants were tried on twenty four counts of conspiracy, money laundering, failing to file IRS currency transaction reports, failing to file customs reports, travel in interstate commerce with the intent to carry on unlawful activities, and wire fraud. Sultan was convicted on all counts, while Yasmin was convicted on three and acquitted on three. From those convictions, Sultan and Yasmin take this appeal.

## I.

### Targeting: A Right to Be Let Alone?

The appellants premise their contention that they were impermissibly targeted by the government's sting operation on two separate grounds. First, they argue that the government engaged in outrageous conduct, and, lacking reasonable suspicion that they were involved in any illegality, violated their "right to be let alone." Alternatively, Sultan argues that targeting based upon religious affiliation violates their first amendment right to freedom of religion. We reject both contentions.

In *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), the Supreme Court foreshadowed the evolution of an outrageous conduct defense deriving from the fifth amendment's due process clause. Although the court concluded that predisposition to commit a crime forecloses application of the entrapment defense, it conceded that "we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from ... obtain[ing] a conviction." *Id.* at 431–32, 93 S.Ct. at 1642–43. Since *Russell*, courts have addressed the availability of the outrageous conduct defense, always recognizing that it can be invoked only "in the rarest and most outrageous circumstances." *United States v. Tobias*, 662 F.2d 381, 387 (5th Cir. Unit B 1981), *cert. denied*, 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982).

Based on these principles, the appellants argue that the government's conduct in approaching Sultan with the money-laundering scheme was egregious enough to constitute a due process violation. A litany of cases in which more extreme government behavior was upheld by courts suggests a contrary conclusion. In *Russell*, when the target of a government sting operation confessed difficulty in obtaining a scarce drug precursor, the government supplied it to him, and later provided a buyer for the finished product. Even so, our court refused to characterize the government's conduct as "outrageous." *Russell*, 411 U.S. at 431–32, 93 S.Ct. at 1642–43.

Similarly, in *Tobias*, a suspect canceled an order for cocaine precursor chemicals placed with a DEA-operated sham company, complaining of his inability to perform the complicated synthesis steps. Undercover DEA agents suggested he attempt the simpler PCP synthesis process and provided him with the needed chemicals, recipes, and instructions to make the drug. Our Court found no due process violation, noting that Tobias's "insistent partic-

ipation" in the PCP production scheme foreclosed a finding of outrageous government conduct. *Tobias*, 662 F.2d at 387; see also *United States v. Simpson*, 813 F.2d 1462, 1466–68 (9th Cir.), *cert. denied*, 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 192 (1987) (upholding the government's actions in persuading an informant to offer sexual favors to entice a targeted person into selling heroin to her); *United States v. Emmert*, 829 F.2d 805, 810–12 (9th Cir.1987) (concluding that an agent's offer of $20,000 and the use of threats and intimidation were not outrageous in an effort to persuade an impoverished college student to locate a cocaine supplier). In light of those authorities, we find no due process violation in this context either.

■ We also join our sibling circuits in rejecting the suggestion raised by the Allibhais that the government should have reasonable suspicion that an individual is involved in some illegality before targeting him in a sting operation. Relying on *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), the Allibhais contend the "right to be let alone" protects citizens from unwarranted and capricious governmental intrusions.[2] Accordingly, they ask that this court impose a reasonable suspicion requirement on the government even though other circuits have refused similar invitations. We likewise decline.

Those circuits that have addressed this issue have uniformly dismissed the notion that the government must have a pre-existing basis for suspecting criminal activity before targeting an individual in an investigation.[3] The only contrary decision was recently reversed *en banc*, bringing the Ninth Circuit in accord with the others.[4]

As the court recognized in *United States v. Jacobson*, 916 F.2d 467, 469 (8th Cir. 1990) (en banc), *cert. granted in part*, —— U.S. ——, 111 S.Ct. 1618, 113 L.Ed.2d 716 (1991), these decisions are premised upon the realization that "[a defendant] has no constitutional right to be free of investigation." *Jacobson*, 916 F.2d at 469. Thus, "the mere fact the undercover investigation is started without reasonable suspicion 'does not bar the conviction of those who rise to its bait.'" *Id.* (*quoting Jannotti*, 673 F.2d at 609). We note that as a practical matter, investigative agencies rarely expend their limited manpower and resources on a mere whim or in fabricating criminal activity. In circumstances in which an investigation unfortunately ensnares a nonpredisposed individual, the defense of entrapment serves as an effective bar to conviction. Accordingly, we find no basis upon which to create a contrary rule from that of other circuits.

■ Finally, we address the appellants' contention that they were impermissibly targeted, in violation of their first amendment rights, because they are Ismaili Muslims. The Allibhais note that the government utilized the informant Hassam, himself an Ismaili, to gain access to their close-knit community. Hassam was initially questioned about possible money laundering activities involving Ismailis, and was presented with a list of almost exclusively Ismaili suspects. These facts notwithstanding, we find no impropriety.

Although the holding does not specifically address investigative targeting, a recent Supreme Court opinion provides some insight into the interplay between the first amendment and the enforcement of crimi-

---

**2.** Their argument derives from Justice Brandeis's famous dissent in *Olmstead*, which characterized the "right to be let alone" as "the most comprehensive of rights and the most valued by civilized men." *Olmstead*, 277 U.S. at 478, 48 S.Ct. at 564.

**3.** *See e.g., United States v. Jacobson*, 916 F.2d 467, 469 (8th Cir.1990) (en banc), *cert. granted in part*, —— U.S. ——, 111 S.Ct. 1618, 113 L.Ed.2d 716 (1991); *United States v. Miller*, 891 F.2d 1265, 1269 (7th Cir.1989); *United States v.*

*Jenrette*, 744 F.2d 817, 824 & n. 13 (D.C.Cir. 1984), *cert. denied*, 471 U.S. 1099, 105 S.Ct. 2321, 85 L.Ed.2d 840 (1985); *United States v. Jannotti*, 673 F.2d 578, 609 (3d Cir.) (en banc), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982); *United States v. Myers*, 635 F.2d 932, 940–41 (2d Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980).

**4.** *See United States v. Luttrell*, 889 F.2d 806 (9th Cir.1989), *vacated in part and modified*, 923 F.2d 764 (9th Cir.1991).

nal laws. *See Employment Div. Dept. of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). In that case, two members of the Native American Church were fired because of their use of peyote, a controlled hallucinogenic substance, during a religious ceremony. When the state ruled that their "misconduct" disqualified them from receiving unemployment benefits, they filed suit, arguing that the ruling violated their first amendment free exercise rights. In approving the state's actions, the court noted, "[w]e have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the state is free to regulate." 110 S.Ct. at 1600.

■ Although we recognize that this is not a case involving the free exercise clause, we consider the Court's teachings in *Smith* persuasive on this issue. Ismaili Muslims are not "relieved ... from obedience to a general law not aimed at the promotion or restriction of religious beliefs." *Id.* (*quoting Minersville School Dist. Bd. of Educ. v. Gobitis,* 310 U.S. 586, 594–595, 60 S.Ct. 1010, 1012–1013, 84 L.Ed. 1375 (1940)). Thus, when the government seeks to enforce a "valid and neutral law of general applicability," *Smith,* 110 S.Ct. at 1600, the fact that an investigation incidentally targets a specific religious group does not render the investigation violative of the first amendment. We reject any contrary suggestion, and uphold the district court's decision not to dismiss the indictment.

### Expert Testimony

■ The Allibhais attempted to call John Costain as an expert witness to testify as to the meaning of taped conversations between the Allibhais, Hassam, and Jacoby. Costain, then a private investigator, had significant law enforcement experience but admittedly had never handled a money laundering case. In response to the government's objection, the trial court requested a proffer of the scope of Costain's testimony, going as far as to permit defense counsel to examine Costain out of the presence of the jury.

The court ruled that the defense was impermissibly attempting to use Costain's testimony to buttress Sultan's. Furthermore, since the court concluded the content of the taped conversations was within the understanding of lay jurors, it ruled the jury was in as good a position as Costain to interpret the meaning of those conversations. Finally, the court indicated that the limited probative value of Costain's testimony was outweighed by the risk that the jury would be confused by his analyses.

The Allibhais notes that the court permitted the government's witnesses, Agents Marshall and Jacoby, to speculate as to the significance of certain statements made by Sultan and Yasmin as well as to comment on why certain evidence was never discovered. Accordingly, they argue the trial court erred in refusing to permit them to rebut that testimony with Costain's.

Reviewing the trial court's decision on the admissibility of that evidence for an abuse of discretion, *United States v. Schmidt,* 711 F.2d 595, 598 (5th Cir.), *cert. denied,* 464 U.S. 1041, 104 S.Ct. 705, 79 L.Ed.2d 169 (1983), we are persuaded by the government's arguments to the contrary. As noted, Marshall and Jacoby testified regarding events in which they participated, such as taped conversations and the execution of search warrants. In contrast, Costain's testimony represented a third party's appraisal of events in which he was not involved.

We are also impressed by the district court's painstaking *in limine* review of the proffered testimony. By permitting defense counsel to elicit sample testimony from Costain outside the presence of the jury, the Allibhais were afforded ample opportunity to demonstrate the admissibility of the evidence. *See United States v. DeLuna,* 763 F.2d 897, 912 (8th Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985).

Finally, as to the district court's determination that Costain's testimony was excludable based on the risk of jury confusion, *see* Fed.R.Evid. 403, we note that our Court gives particular deference to the trial court's assessment in this realm. *United*

*States v. Edelman*, 873 F.2d 791, 795 (5th Cir.1989). Accordingly, we find no abuse of discretion in the trial court's ruling.

### The Jury Charge

Although neither appellant challenges the jury's finding regarding entrapment, both appellants contend that the trial court's instruction as to that defense was erroneous. Assuming without deciding that both appellants were entitled to the entrapment charge,[5] we find no reversible error.

▮ The appellants first object to the portion of the charge that addresses acceptable conduct of undercover agents:

> The undercover activity may take many forms, including persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward or pleas based on need, sympathy, or friendship.

The Allibhais note that this language has never been sanctioned by this circuit, and that by approving such tactics, the district court eviscerated the entrapment defense. As both parties concede, we review a jury instruction to determine whether "the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them." *United States v. Stacey*, 896 F.2d 75, 77 (5th Cir.1990). "A trial judge is given substantial latitude in tailoring instructions so long as they fairly and adequately cover the issues presented." *United States v. Pool*, 660 F.2d 547, 558 (5th Cir. Unit B 1981).

Although our court has never specifically reviewed the exact language contained in this charge,[6] we have approved instructions that suggest that behavior typically unbecoming law enforcement officials is appropriate in the context of an undercover operation. *See e.g., United States v. Mattoni*, 698 F.2d 691, 694 (5th Cir.1983) (approving an instruction indicating that "agents had a right to assume other identities, change their character, [and] make offers to sell or provide controlled substances"); *Pool*, 660 F.2d at 557 (upholding an instruction that "it is proper for a government agent to pretend to be someone else and to offer either directly or through an informer or other decoy to engage in an unlawful transaction"); *United States v. Fera*, 616 F.2d 590, 596 (5th Cir.1980) (approving an instruction that it is "sometimes necessary and permissible for the government to use stratagems, artifices, ruses, and undercover agents or investigators who may use assumed names and conceal their true identity").

Furthermore, because the entrapment defense "focus[es] on the intent or predisposition of the defendant to commit the crime ... rather than upon the conduct of the Government's agents," *Hampton v. United States*, 425 U.S. 484, 488, 96 S.Ct. 1646, 1649, 48 L.Ed.2d 113 (1976), the charge is adequate if it focuses the jury's attention on whether "the Government's deception actually implant[ed] the criminal design in the mind of the defendant" *Russell*, 411 U.S. at 436, 93 S.Ct. at 1645. Because we find that this charge, as a whole, adequately focused the jury's in-

---

**5.** The government maintains because Yasmin was recruited to participate in the money-laundering scheme by her husband rather than by a government agent, she cannot claim she was "entrapped" as a matter of law. *See United States v. Sarmiento*, 786 F.2d 665, 667–668 (5th Cir.1986). Yasmin challenges that contention, arguing that her presence at the initial meeting between Hassam and Sultan subjected her to the risk of entrapment. Because we find no reversible error in the charge, we need not resolve that factual dispute.

**6.** We note that the Ninth Circuit has approved identical language in *United States v. North*, 746

F.2d 627 (9th Cir.1984), cert. denied, 470 U.S. 1058, 105 S.Ct. 1773, 84 L.Ed.2d 832 (1985). Rejecting North's contention that the instruction improperly sanctioned threats and coercive activities on the part of law enforcement agents, that court noted that viewing the instruction as a whole, it "clearly distinguished between the issues of improper government behavior and North's predisposition to commit illegal acts." *Id.* at 631. We reject the appellants' suggestion that the Ninth Circuit's subsequent opinion in *United States v. Hoyt*, 879 F.2d 505, 510 & n. 5 (9th Cir.1989) implicitly rejects, dilutes, or limits that court's holding in *North*.

quiry on the question of predisposition, we find no reversible error.

■ Next, the appellants complain that the charge instructing the jury to consider the applicability of the entrapment defense separately as to each count of the indictment was improper. We are unpersuaded.

As the government notes, the Fifth Circuit Pattern Jury Instructions admonish juries to consider each count in an indictment separately from other joined counts. *See Fifth Circuit Pattern Jury Instructions* § 1.24 (1990). It is apparent that the charge actually benefitted the Allibhais, since it permitted the jury to consider the applicability of the defense to each count. Absent such a charge, if the jury found Yasmin and Sultan were not entrapped at the outset of the sting, it would not need to consider whether subsequent events affected their predisposition to engage in later laundering activities. Accordingly, the Allibhais may not claim prejudice from this instruction, since it places an even greater burden on the government. *United States v. Garrett*, 583 F.2d 1381, 1388–89 (5th Cir.1978).

■ Finally, the appellants contend that the trial judge should have instructed the jury not to consider evidence of Sultan's prior money laundering activities in Africa. In support of the district court's decision to refuse the requested instruction, the government cites *United States v. Larson*, 722 F.2d 139, 143 n. 8 (5th Cir.1983), *cert. denied*, 466 U.S. 907, 104 S.Ct. 1688, 80 L.Ed.2d 161 (1984), a case holding that a jury may properly consider evidence of pre-indictment activities when the defendant asserts the entrapment defense. Although *Larson* involved conduct occurring *in the United States*, we find no logical basis to exclude Sultan's African activities from the scope of the *Larson* holding.

## II.

■ Yasmin and Sultan each raise several challenges to the district court's application of the sentencing guidelines, disputing both the court's factual findings and its application of the guideline provisions to

those findings. The Allibhais' sentences must be upheld unless they demonstrate they were imposed in violation of the law, were imposed as a result of an incorrect application of the guidelines, or were outside the range of the applicable guidelines and were unreasonable. 18 U.S.C. § 3742(e); *United States v. Ebertowski*, 896 F.2d 906 (5th Cir.1990). This court must give "due regard to the opportunity of the district court to judge the credibility of witnesses" by accepting its findings of fact unless they are clearly erroneous. 18 U.S.C. 3742(e). Beyond even the clearly erroneous standard, this court must give "due deference to the district court's application of the guidelines to the facts." Id.; *see United States v. Woolford*, 896 F.2d 99, 103–04 (5th Cir.1990). Finding no error, we uphold the sentences imposed by the district court.

### Organizer Status

■ Sultan argues that the district court improperly enhanced his sentence under section 3B1.1(a) based on its finding that he was the "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." Although Sultan does not dispute that he was the organizer of the money-laundering ring, he does quibble with the court's finding that his organization was "otherwise extensive." Relying on cases from other circuits, Sultan argues that such a finding has typically been sustained when the government infiltrates an ongoing money-laundering business involving "clients" other than the undercover operatives. *See e.g., United States v. Donahue*, 885 F.2d 45 (3d Cir.1989); *United States v. Cuevas*, 847 F.2d 1417 (9th Cir.1988), *cert. denied*, 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989). We are unpersuaded.

The evidence adduced at trial and in the sentencing investigation reveals that Sultan's organization was indeed extensive. His money-laundering scheme took him to at least two foreign countries and spanned almost three years. Furthermore, by the time of his arrest, Sultan had laundered over one million dollars and had expressed

the willingness and capability to handle even larger sums of ill-gotten gains. Although the scheme involved only four participants,[7] Sultan "used the unknowing services of many outsiders" such as bank employees, a fact deemed relevant in the commentary to the section. *See* U.S.S.G. § 3B1.1, comment. (n.2). Accordingly, we find no error in the district court's application of this enhancement provision.

### Acceptance of Responsibility

 Both Yasmin and Sultan contend that the district court erred in denying them the two level reduction for acceptance of responsibility. Under section 3E1.1, such a reduction is permitted "[i]f the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct." U.S.S.G. § 3E1.1. Because the sentencing judge is in the best position to gauge genuine contrition, "the standard of review under this provision is even more deferential than under the clear error standard." *United States v. Roberson*, 872 F.2d 597, 610 (5th Cir.), cert. denied, — U.S. —, 110 S.Ct. 175, 107 L.Ed.2d 131 (1989). Reviewing the district court's assessment accordingly, we find no error.

Relying on the Sixth Circuit's opinion in *United States v. Fleener*, 900 F.2d 914, 918 (6th Cir.1990), the appellants argue that the district court improperly denied them the section 3E1.1 reduction based on their decision to plead the defense of entrapment. Even if we were bound by that decision, we would still disagree with the Allibhais' interpretation of it. In *Fleener*, the government concocted a sting operation targeted at individuals trafficking in child pornography. At trial, Fleener argued that he had been entrapped by the undercover agent;

the jury disagreed, and found him guilty. At sentencing, the district court found he had accepted responsibility for his actions, and afforded him the two-level reduction. The government appealed, arguing that the defendant's resort to the entrapment defense *completely barred* application of section 3E1.1. The Sixth Circuit affirmed, however, holding that "the district court did not err in considering a reduction for acceptance of responsibility even though [Fleener] raised an entrapment defense at trial."

Thus, the *Fleener* decision does not *entitle* a defendant to the reduction, but merely permits a district court to consider section 3E1.1 even when the defendant pleads entrapment.[8] In this case, the district judge noted that even though the Allibhais professed contrition at sentencing, their attitudes at trial "did not comport with the sort of attitude that this reduction in offense level is for." Even assuming that some of the sentencing judge's remarks suggest he considered the Allibhais' resort to the entrapment defense, these remarks are irrelevant, since the judge need not give reasons for his denial of the section 3E1.1 reduction in this Circuit. *United States v. Hardeman*, 933 F.2d 278, 283 (5th Cir.1991). We will not disturb the district court's decision to deny the reduction for acceptance of responsibility.

### Calculating Yasmin's Base Offense Level

 Yasmin first contends that the district court erroneously calculated her base offense level by considering laundered sums for which her husband was convicted, but for which she was acquitted. We disagree.

7. Because we conclude Sultan's organization is "otherwise extensive" within the meaning of section 3B1.1(a), we need not address the government's strained argument that unwitting employees of the Belgian and Canadian banks used by Sultan may be included in determining whether "five or more participants" were involved in the scheme.

8. We also note the significance of the posture of the *Fleener* decision. Unlike in our case, the government in that case challenged the district

court's decision to award the reduction. Reviewing that decision deferentially, the Sixth Circuit *affirmed*. Here, the appellants request that this court *reverse* the district court's assessment of the law and facts of this case. As our court has noted, and as the *Fleener* court recognized, our deferential standard of review "will nearly always sustain the judgment of the district court in this area." *Fleener*, 900 F.2d at 917 (quoting *United States v. Thomas*, 870 F.2d 174, 176 (5th Cir.1989)).

Because the government need only establish facts for use in sentencing by a mere preponderance of the evidence, our Court has held that the sentencing court may rely on facts underlying an acquitted count if the preponderance standard is satisfied. *United States v. Juarez–Ortega,* 866 F.2d 747, 748 (5th Cir.1989). Although the jury was not convinced beyond a reasonable doubt that Yasmin was criminally responsible for the total sum laundered, the district court concluded that the evidence preponderated towards her involvement in even the acquitted counts. We find no error in that decision and thus reject her contention.

■ Next, Yasmin contends that the district court improperly applied section 2S1.3(a)(1)(C) to enhance her base offense level because she "reasonably should have believed that the [laundered] funds were criminally derived property." In support of this argument, she relies on polygraph reports and her own statements that she thought the money was legitimately procured. However, the district court need not credit Yasmin's self-serving testimony, and is free instead to consider other evidence, such as the way Yasmin handled the funds, in concluding that she was aware of their character. We are unwilling to disturb the district court's credibility determination in this regard.

### Minimal/Minor Participant Status

■ Yasmin also argues that she was entitled to a reduction in her base offense level because she was a relatively insignificant player in her husband's scheme. We are unmoved.

Guideline section 3B1.2 provides a two- to four-level reduction in the base offense level for those offenders found to be relatively less culpable than others involved in the same scheme or conspiracy. *See United States v. Buenrostro,* 868 F.2d 135, 137 (5th Cir.1989). The guidelines define "minimal participant" as one who demonstrates a "lack of knowledge or understanding of the scope and structure of the enterprise." U.S.S.G. § 3B1.2, comment. (n.1). A "minor participant" is similarly defined as one who is "less culpable than most other participants, but whose role could not be described as minimal." *Id.* (n.3). Because most offenses are committed by participants of roughly equal culpability, our Court has noted that "it is intended that [the adjustment] will be used infrequently." *United States v. Nevarez–Arreola,* 885 F.2d 243, 245 (5th Cir.1989). We are unpersuaded by Yasmin's suggestion that either classification applies to her.

Yasmin performed an important role in the laundering scheme: she relayed messages between Sultan and their "clients," counted the money to verify the sums, and on at least one occasion actually transported the money to Belgium. We find no clear error in the district court's conclusion that Yasmin was not a minor or minimal participant in these activities.

### Constitutionality of the Guidelines

Finally, Yasmin argues that the district court's application of the guidelines unconstitutionally deprived her of due process of law. Her contention that the court improperly considered hearsay testimony has been repeatedly dismissed by this Court. *United States v. Ammirato,* 670 F.2d 552, 557 (5th Cir.1982). Her arguments that the district court improperly attributed sums specified in the acquitted counts to her and that she was erroneously denied a reduction for acceptance of responsibility have been adequately addressed and present no further constitutional concerns.

We also dismiss her argument that she has been punished because of her religious affiliation with the Ismaili Muslim faith. Yasmin points to a statement in the PSR noting that she should have been aware, "as an Ismaili Muslim," of the frequent practice of exporting cash out of the United States to the Aga Khan. However, the probation officer added that the activities for which Sultan and Yasmin were indicted were not connected to those religious practices. In fact, the court never even mentioned Yasmin's religious faith at sentencing. Accordingly, we find that the guidelines afforded Yasmin all the due process to which she was entitled.

*Conclusion*

For the foregoing reasons, the judgment of the district court is

AFFIRMED.