**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

---

No. 93-2085

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

DAVID J. RAGAN,

Defendant-Appellant.

---

Appeal from the United States District Court
for the Southern District of Texas

---

(June 14 1994)

Before WOOD[*], SMITH, and DUHÉ, Circuit Judges.

HARLINGTON WOOD, JR., Circuit Judge:

On September 21, 1992, a jury found David J. Ragan, formerly the head securities trader for ContiArbitrage-Houston (CAH), guilty of eighteen counts of mail and wire fraud pursuant to 18 U.S.C. § 1341 and 18 U.S.C. § 1343. Ragan raises several issues on appeal, but we shall confine our analysis to Ragan's argument that insufficient evidence existed for the jury to find him guilty beyond a reasonable doubt. We may so limit our inquiry because the record clearly supports Ragan's contention that every count of the jury verdict against him lacked adequate

---

[*]Circuit Judge of the Seventh Circuit, sitting by designation.

1

support.

From August 1981 through May 1984, Ragan worked for CAH, a branch office of ContiCommidity Services, Incorporated (CCS). CCS was a large commodity brokerage company registered with the Commodities Futures Trading Commission as a futures commission merchant. CCS hired Ragan in 1981 to manage CAH and conduct a government securities arbitrage program. Arbitrage trades are, in essence, simultaneous purchases and resales of government securities with the anticipation of an immediate profit. In particular, Ragan purchased treasury bills and treasury notes in the CAH government securities arbitrage program.

Although the government permits some securities dealers, known as primary dealers, to engage in direct competitive bidding for securities at government securities auctions, CCS was not a primary dealer. Rather, CCS was a secondary dealer, having to trade securities on the Federal Reserve Wire. CCS would purchase government securities from a primary dealer via the Federal Reserve Wire, the primary dealer would pass the securities on to CCS in the name of CCS, and CCS would in turn internally credit ownership of the securities to its customers.

As part of that process, Ragan's clients at CAH executed powers of attorney authorizing Ragan to conduct legitimate trading at his discretion. Ragan received commissions on each of these trades. The transactions were highly leveraged, meaning that the client actually invested ten percent or less of the total amount invested, a high risk that carried with it a

2

targeted rate of return on the invested equity of fifteen to twenty percent. Clients covered their potential losses by giving CAH margins, collateral sufficient to cover any losses incurred at the close of trading on a given day.

When Ragan made trades for his customers, he sent them confirmation slips explaining what was bought, what was sold, and what the price was. The clients also received monthly statements summarizing their trading activity for the month. In 1983, CCS hired Computed Information Services (CIS) to generate confirmation slips and monthly statements. CAH transmitted its data via modem to the Chicago office of CIS for processing. The following day, a Chicago CCS employee would compare trade tickets or a trade blotter from the previous day to the data generated by the computer. That year, several of Ragan's clients began to question the amount of profits or losses on their trading based on the statements they had received.

The government investigated Ragan's trading activities, and came to believe that Ragan had not only been involved in legitimate government securities trading, but that he also had conducted several fictitious trades for the purpose of generating commissions for himself. The government further believed that Ragan would allocate portions of the fictitious trades to CCS customers, including himself and his father, and that he then would transfer the information by wire communication to CIS for processing, constituting wire fraud in violation of 18 U.S.C. § 1343. Because the information processed by CIS was sent through

the mail to Ragan's customers, the government also concluded that Ragan's activities might constitute mail fraud in violation of 18 U.S.C. § 1341.

The government therefore sought an indictment against Ragan, and on January 30, 1992, a federal grand jury indicted Ragan on eighteen counts of mail and wire fraud. The case went to trial on August 17, 1992, and after the government presented its case in chief, Ragan rested without putting on a defense. On September 14, 1992, the jury found Ragan guilty of all offenses alleged in the indictment. On September 21, Ragan moved for a judgment notwithstanding the verdict or alternatively a new trial, which the district court denied on September 28. On January 12, 1993, the district court sentenced Ragan to concurrent five-year terms of imprisonment on each of the first seventeen counts and five years on count eighteen (which it ordered suspended for five years), and ordered Ragan to pay $50,000 in restitution and a special assessment of $900.

Ragan now appeals, contending that insufficient evidence existed to link him to the fictitious trades in question. In analyzing this issue, we must be cognizant that courts of appeal should not substitute their judgment for that of the jury. Rather, when determining if sufficient evidence existed to support a guilty verdict, we must determine whether "viewing the evidence and the inferences therefrom in a light most favorable to the jury's guilty [verdict], a rational trier of fact could have found [the defendant] guilty beyond a reasonable doubt."

4

United States v. Velgar-Vivero, 8 F.3d 236, 239 (5th Cir. 1993)
(citations omitted). Although the strict nature of this standard
demonstrates our reluctance to interfere with jury verdicts, this
case is an example of why courts of appeal must not completely
abdicate responsibility for reviewing jury verdicts.

To establish that Ragan committed mail fraud in violation of
18 U.S.C. § 1341, the government was required to prove that Ragan
used the mails for the purpose of executing a scheme to defraud.
United States v. El-Zoubi, 993 F.2d 442, 445 (5th Cir. 1993). To
establish that Ragan committed wire fraud in violation of 18
U.S.C. § 1343, the government was required to prove that Ragan
used or caused the use of wire communications in furtherance of a
scheme to defraud. United States v. Dula, 989 F.2d 772, 778 (5th
Cir. 1992). The core question of each statutory provision, then,
is whether Ragan was in fact involved in a scheme to defraud. If
the government failed to present evidence of Ragan's involvement,
a rational trier of fact could not have found Ragan guilty of
mail or wire fraud beyond a reasonable doubt. See Velgar-Vivero,
8 F.3d at 240-41 (evidence was insufficient because government
failed to sufficiently link defendant to the criminal activity in
question).

Here, both parties agree that Ragan never personally entered
any information onto the fictitious trade tickets that were
transmitted via wire and mail to CCS and its customers. Rather,
another employee at CAH, Steve Davis, entered all of the
information on the tickets. Because Ragan was not directly

5

linked to the trades, the government was required to establish that Ragan was so involved with the information being placed onto the trade tickets by Davis that one could say Ragan "caused" the information to be given to customers and CCS; without such evidence, no rational jury could have convicted Ragan.  See United States v. Vontsteen, 872 F.2d 626, 628 (5th Cir. 1989). To prove this linkage, the government relied exclusively on the testimony of Davis.

The government contends that Davis testified that Ragan supplied him with the information that eventually appeared on the fictitious trade tickets.  Although the government identifies three pages in the record in which Davis purportedly linked Ragan to the indictment trades, the government's characterizations of what Davis said and what the record actually reveals on those cited pages are quite dissimilar.  The first government citation to the record[1] concerns whether Davis believed that a particular trade ticket was a test ticket or an actual ticket,[2] and contains no testimony regarding Ragan.

In the second cited part of the record,[3] Davis testified that "[g]enerally, Mr. Ragan gave us most of our transactions."

---

[1]The government first cited to page 1186 of the record.

[2]Ragan sought to establish on cross-examination that the transactions in question were not actual trades, but rather were tests of the CIS data processing system.  We need not address the true nature of the relevant trades, however, given our conclusion that insufficient evidence existed to establish linkage between Ragan and the trades, whether real or fictional.

[3]The second citation was to page 1191 of the record, and relevant information continues on page 1192.

The trial court let this testimony in, however, with a very forceful limiting instruction:

> Ladies and gentlemen, I'm going to allow this in.  Keep in mind that eventually the Government is going to have to link up all of the charges in the indictment to [Ragan].  All right.  They're talking about general policy in the office and what generally went on, and [to] this extent I'll allow him to do it, but the questions you will receive will be very pointed as to Mr. Ragan.

As the limiting instruction made clear, Davis's testimony regarding general office procedure would become important only if the government actually linked Ragan to the indictment tickets.

On the third page of the record cited by the government,[4] the following exchange is recorded:

> Q.    As to the last group of trade tickets that you were shown, Mr. Davis, . . . [w]here would you have gotten the information that appears on those trade tickets?

> A.    From Mr. Ragan.

This, the government contends, is the critical testimony linking Ragan to the indictment tickets.  A closer examination of the record, however, reveals no demonstration of linkage whatsoever.

The question asked of Davis began, "As to the last group of trade tickets . . . ."  To what group of tickets does this refer?  The record reveals that the last group of trade tickets the government asked Davis about were uncharged trades, not the indictment transactions.  In fact, the only testimony by Davis regarding the indictment transactions reveals that Davis had no

---

[4]The third citation was to page 1217 of the record, but page 1217 refers to information beginning on page 1199 and continues through page 1221.

7

knowledge of whether those trades originated with Ragan:

> Q. I know you were asked on direct: "Well, who told you to do what?" It always seems to be Dave Ragan, but when I'm asking you specifically because this is the counts of the indictment, do you remember him telling you to do that?
>
> A. No, I do not remember him telling me.

When further asked about individual indictment tickets, Davis testified that he did not recall Ragan giving him those tickets.

In our reading of the record, we can identify no evidence linking Ragan to the indictment transactions. Without such evidence, a rational trier of fact could not have found Ragan guilty beyond a reasonable doubt. Because the government's evidence against Ragan was legally insufficient to establish guilt beyond a reasonable doubt, the jury verdict against Ragan must be REVERSED.