IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-10786
_____

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

                    versus

HENRY EDWARD EUGENE BONHAM;
BEVERLY LARAE BULGER,

                                        Defendants-Appellants.
_____

Appeals from the United States District Court
for the Northern District of Texas
(4:98-CR-88-1-Y)
_____
June 22, 1999

Before KING, Chief Judge, and REYNALDO G. GARZA and JOLLY, Circuit
Judges.

E. GRADY JOLLY, Circuit Judge:[*]

     Dr. Henry E. Bonham, a psychiatrist, and Beverly L. Bulger,

his office manager, appeal their convictions and sentences,

involving Medicaid, Medicare, and CHAMPUS fraud.  They were

convicted of twenty-two counts of mail fraud and aiding and

abetting mail fraud, and one count of conspiring to commit mail

fraud and to submit a false claim to a federal governmental agency.

Bonham was also convicted of an additional count of submitting a

false claim to a federal governmental agency and aiding and

abetting the submission of a false claim.  Bonham argues for

_____

     [*]Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

reversal of each of his convictions, contending: (1) none of the convictions are supported by the sufficiency of the evidence; (2) each of the convictions violate the due process clause of the Fifth Amendment to the United States Constitution; (3) the district court erred under Fed.R.Evid. 404(b) in admitting the extrinsic evidence of his improper billing practices; and (4) his prosecution runs afoul of the separation of powers clause of the United States Constitution.

Bulger also contends that the evidence is insufficient to support her mail fraud and false claim convictions. In her remaining arguments on appeal, Bulger challenges the district court's application of §§ 2F1.1 and 3A1.1(b) of the United States Sentencing Guidelines.

For the foregoing reasons, we affirm each of the defendants' convictions and sentences.

I

A

Appellant Dr. Henry E. Bonham maintained a psychiatric practice in various parts of the state of Texas. The government alleged that Bonham, through the use of deceptive billing practices, bilked the federal government out of millions of dollars in health care proceeds. The evidence showed that from 1991, onward, Bonham entrusted the day-to-day operations of his practice to his office manager Beverly Bulger. The fact that is predicate

2

to this criminal case, however, is that Bonham was a certified provider of services under three federally funded health insurance programs--Medicare Part B, Medicaid, and the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS").

Briefly stated, Medicare Part B, Title XVIII of the Social Security Act, 42 §§ 1395j to 1395w-4, is a health insurance program that provides medical benefits primarily to persons sixty-five years of age and older who are eligible for Social Security retirement benefits and to individuals under sixty-five who have received Social Security benefits for at least two years. Medicaid, Title XIX of the Social Security Act, § 42 U.S.C., 1396-1396v, is a federal and state cooperative cost-sharing program, which provides necessary medical assistance to families and individuals with insufficient income and resources. Finally, CHAMPUS is a Defense Department program that provides medical benefits to the spouses and unmarried children of living and deceased members of the military services.

Further background information on these federal health care programs is instructive in understanding the exact nature of the appellants' alleged fraudulent billing practices. Under the federal regulations applicable to Medicare, Medicaid, and CHAMPUS, a physician is required to submit each of his claims for reimbursement to the appropriate intermediary or carrier, on the claim form prescribed by the Health Care Financing Administration

3

(HCFA)--the HCFA 1500 form.  To accurately complete the HCFA 1500 form, the physician is required to provide, <u>inter alia</u>, the following information: his medical provider number, relevant patient information, the appropriate diagnostic billing code identifying the services for which reimbursement is sought, and the identity of the health care provider who rendered the services. The face of the HCFA 1500 form also includes the following certification--one that a physician attests to each time that he submits a claim:

> **SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, CHAMPUS, FECA AND BLACK LUNG)**
>
> **I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise permitted by Medicare or CHAMPUS regulations.**
>
> **For services to be considered as "incident" to a physician's professional service, (1) they must be rendered under the physician's immediate personal supervision by his/her employee, (2) they must be an integral, although incidental part of a covered physician's service, (3) they must be of kinds commonly furnished in physician's offices, and (4) the services of nonphysicians must be included on the physician's bills.**
>
> **[. . . .]**
>
> **No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 C.F.R. 424.32).**

Thus, to determine whether a patient has been provided a compensable medical service under the Medicare, Medicaid, or

CHAMPUS program, or to determine the appropriate pay scale by which to reimburse the physician for such care, the federal agencies rely heavily, if not solely, on the representations the physician has made on the HCFA 1500 form.  The federal agencies likewise rely on the physician's use of a diagnostic billing code to determine what type of health care the patient has received.  The appellants' alleged violation of this honor system is the basis for the mail fraud convictions underlying this appeal.

The government charged that Bonham and Bulger, using the HCFA 1500 form, executed a billing scheme whereby they submitted fraudulent insurance claims to Medicare, Medicaid, CHAMPUS, private insurance companies, and individuals through the United States mail.  The insurance claims were fraudulent because the psychiatric services for which Bonham and Bulger sought reimbursement had not been personally provided by Bonham, nor were the services provided under his direct personal supervision[1], or rendered a "incident to" a medical service provided by him, as required by the applicable federal regulations.  In submitting the HCFA 1500 forms, the Bonham and Bulger deliberately misused billing codes, which, by their

---

[1]To comply with the direct personal supervision requirement, the physician is not required to be present in the same room with his aide.  However, the physician must be in the office suite and immediately available to provide assistance and direction throughout the time services are being performed.  Medicare and Medicaid Guide (CCH), § 3315 (citing MCM § 2050.2); see also 42 C.F.R. 411.351.

5

plain language, contemplated psychiatric and other medical services personally provided by a physician.[2]

B

On January 7, 1997, the grand jury returned a 26-count superseding indictment against Bonham and Bulger.[3] Each count of the indictment pertained to the appellants-defendants' unlawful billing practices and their submission of false and fraudulent insurance claims. Specifically, the indictment charged both appellant-defendants with 23 counts of mail fraud and aiding and abetting mail fraud (counts 1-23),[4] and one count of conspiring to commit mail fraud and to submit a false claim to a federal

---

[2]From the record before us, its seems that Bonham and Bulger customarily submitted the claims using the following diagnostic billing codes: 90801 (psychiatric diagnostic interview and examination); 90830 (psychological testing); 90841 (individual psychotherapy, time unspecified); 90843 (individual psychotherapy, 20 to 30 minutes); 90844 (individual psychotherapy, 45 to 50 minutes); 90845 (medical psychoanalysis); 90846 (family psychotherapy); 90862 (management of psychotropic medication); 99238 (hospital discharge day management); 99253 (inpatient consultation); and 99262 (follow-up patient consultation). These codes, referred to herein as "CPT codes," were developed by the American Medical Association ("AMA"), and are listed in the AMA's manual, Common Procedural Terminology, Fourth Edition.

[3]The superceding indictment also named a third defendant, Gina Weems, under counts 1-23, and count 26. The district court granted Weems a judgment of acquittal during the course of trial.

[4]18 U.S.C.§ 1341 and 2.

governmental agency (count 26).[5] Bonham, individually, was indicted on 2 counts of submitting a false claim to a federal governmental agency and aiding and abetting the submission of a false claim (counts 24-25).[6]

On March 3, 1997, the defendants' joint trial commenced, and on March 28, 1997, the jury rendered its verdict. The jury convicted Bonham on counts 1-3 and 5-23 (mail fraud and aiding and abetting mail fraud), count 24 (submitting a false claim to a federal governmental agency and aiding and abetting the submission of a false claim), and count 26 (conspiring to commit mail fraud and to submit a false claim). Next, the jury found Bulger guilty of mail fraud, specifically, counts 1-3, and 5-23, and conspiring to commit mail fraud and to submit a false claim (count 26). Both defendants were acquitted on mail fraud (count four).

On July 14, 1997, after a contested sentencing hearing, the district court sentenced Bonham to 60 months imprisonment on count 1, and 60 months imprisonment on each of counts 2-3, 5-24, and 26. The district court ordered that Bonham's sentences on counts 2-3, 5-24, and count 26 run concurrently with one other, but consecutively to his sentence on count 1, only to the extent necessary to produce a combined sentence of 87 months. Bonham was also ordered to make restitution in the amount of $3,911,000.

---

[5]18 U.S.C. § 1341; 18 U.S.C. 287.

[6]18 U.S.C. § 287 and 2.

Next, the district court ordered Bulger to serve 46 months imprisonment on each of her convictions, with the sentences to run concurrently. In calculating Bulger's sentence the district added a two-level enhancement to Bulger's offense level under U.S.S.G. § 3A1.1(b), based on the unusual vulnerability of the victims of the mail fraud--Dr. Bonham's patients. The district court also increased Bulger's offense level by ten under U.S.S.G. § 2F1.1(b)(1)(N), based on the $3,911,000 in loss caused by the fraud. Bulger and Bonham both timely appealed each of their judgments of conviction and sentences.

## II

As a threshold matter, we note that many of the arguments that Bonham and Bulger have raised on appeal are frivolous. Specifically, we find no merit in Bonham's arguments under the due process clause,[7] the separation of powers clause,[8] nor Fed.R.Evid.

---

[7]Bonham's reliance on Siddiqi v. United States, 98 F.3d 1427 (2d Cir. 1996), is misplaced. The record is clear that during the prosecution of Bonham's case, and likewise on appeal, the government pursued the same, single theory of guilt; one, we add, that previously earned our approval in United States v. Sidhu, 130 F.3d 644, 647 (5th Cir. 1997). Furthermore, our discussion in part three of this opinion belies Bonham's contention that the government's experts failed to agree on the proper interpretation of the CPT codes established by the AMA. We therefore reject Bonham's alternative due process argument that the CPT codes are unconstitutionally vague. In sum, we find no due process violation with respect to Bonham's convictions.

[8]We find no purpose in addressing at any length, under the plain error standard, or otherwise, Bonham's separation of powers argument raised for the first time of on appeal. Bonham contends that his convictions violate the separation of powers clause

404(b)[9].  Similarly implausible are Bulger's arguments that the district court erred in adding a ten-level enhancement to her offense level under U.S.S.G. § 2F1.1, based on the loss caused by

---

because he was prosecuted, not for a crime enacted by Congress, but for the improper use of the CPT codes devised by the AMA, which resulted from agency, i.e., executive action of the HCFA in contracting with the AMA for the use of its CPT codes in the Medicare, Medicaid and CHAMPUS programs.  Bonham, in advancing this argument, has misconstrued the basis of his federal convictions, which rest on his fraud in violation of specific criminal statutes.

[9]We cannot say that the district court erred under Fed.R.Evid. 404(b) in admitting extrinsic evidence of Bonham's improper billing practices through the testimony of Robert and Robin Wester.  The Westers' testimony provided circumstantial proof of the scheme to defraud the federal and private health care insurers, as well as Bonham's specific intent to commit mail fraud.  We have previously recognized that bad acts or wrongs, which establish a scheme to defraud, are not the type of extrinsic acts contemplated by Fed.R.Evid.404(b), and therefore the rule does not prohibit the admission of such evidence.  United States v. Hatch, 926 F.2d 387, 394 (5th Cir. 1991).

the fraud[10], and in adjusting her offense level upward by two under

the vulnerable victim enhancement, U.S.S.G. § 3A1.1(b)[11]

---

[10]We agree with the government that the district court's calculation of the loss resulting from the fraud at $3,911,000, was both a reasonable and conservative estimate of the loss. See Sidhu, 130 F.3d at 651 (citations omitted). The district court initially calculated the loss resulting from the fraud at $8,693,000. The district court then gave the defendant a 25% credit, representing the time Bonham purportedly spent personally treating his patients. The record illustrates that the district court was generous in this regard, however. Bonham's office records show that he spent even a lesser percentage of time with his patients. The district court further reduced its loss calculation by yet another 40% to reflect payments that Bonham did not expect to receive from the insuring entities and patients. This last reduction netted the district court's final estimate of $3,911,000. Moreover, in making its initial calculation, the district court only considered the fraudulent insurance claims submitted from January 1990 to November 1994, and did not include the claims Bonham filed against Medicaid in 1990 and 1991, nor his claims filed against Medicare in 1990. Finally, in adjusting Bulger's offense level upward by ten, the district court rejected the thirteen-level increase recommended in the PSI Report, and departed downward from the adjustment mandated by the guideline itself. See U.S.S.G. § 2F1.1(b)(1)(N) (if loss is more than $2,500,000 add **13** level increase). In doing so, the district court concluded that a thirteen-level increase overestimated Bulger's culpability, as she was only Bonham's employee and not the director of the mail fraud scheme. See Sidhu, 130 F.3d at 651 (citations omitted) (noting district court properly accounted for defendant's relative culpability under U.S.S.G. § 2F1.1 by treating him as a "minor participant"). In the light of this record, we cannot say that Bulger has demonstrated error with respect to the district court's application of U.S.S.G. § 2F1.1.

[11]Bulger argues that the district court's application of U.S.S.G. § 3A1.1(b) (1995) is improper because she is neither a physician, nor did she stand in a fiduciary relationship with Bonham's patients. Alternatively, Bulger contends that the true "victims" of the mail fraud scheme were Medicaid, Medicare, and CHAMPUS--entities who are not "unusually vulnerable" for the purposes of the guideline. Each of these contentions are meritless.
U.S.S.G. § 3A1.1(b) (1995) provides that "if the defendant knew or should have known that a victim of the offense was

.We apply the sentencing guidelines in effect on the date that Bulger was sentenced, July 14, 1997. U.S.S.G. §§ 1B1.11(a) and (b)(1). See also 18 U.S.C. § 3553 (a)(4)(A).[12]. We likewise discern no merit to the defendants' remaining points error, namely their numerous challenges to the sufficiency of the evidence. However, because of the manner in which Bonham and Bulger have gilded over the substantial evidence against them, we find that each of the defendants' sufficiency of the evidence arguments warrant specific attention.

We further note that the evidence presented by the government in support of the defendants' convictions and sentences is considerably commingled and overlapping. Thus, we will first address, collectively, Bonham and Bulger's challenge to the sufficiency of the evidence supporting the mail fraud counts. Second, we will address the defendants' contention that no proof exists in support of their conspiracy conviction. Third, we will dispose of Bonham's challenge to his false claim conviction. With this framework in mind, we turn now to the record before us.

---

unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct, increase by **2** levels."

Nothing in the plain language of the guideline, nor its commentary, can be read to support Bulger's interpretation of the vulnerable victim enhancement.

Second, in applying the vulnerable victim enhancement to Bulger's offense level, the district court concluded that Bulger was aware that Bonham's patients were unusually vulnerable because of their psychological conditions. The district court further concluded that "[b]ecause of their mental and emotional conditions, Bonham was able to convince patients or their families that hospitalization was necessary. By targeting these groups of individuals, Bulger and Bonham were able to access the benefits afforded by the insurance carriers." The district court's factual finding is entirely supported by the record, and, thus, we accord the district court the appropriate deference. Moreover, we have time and again recognized that a physician's unwitting patients, specifically, those with mental infirmities, are the "unusually vulnerable" victims of the physician's fraudulent billing scheme. United States v. Burgos, 137 F.3d 841, 844 (5th Cir.), cert. denied, 119 S.Ct. 833 (1999); United States v Sidhu, 130 F.3d 644, 655 (5th Cir. 1997); United States v. Bachynsky, 949 F.2d 722, 735-36 (5th Cir. 1991). This rationale is controlling here. We find no error with the district court's application of U.S.S.G. § 3A1.1(b).

11

III

A

Bonham challenges the sufficiency of the evidence supporting his convictions for twenty counts of mail fraud and aiding and abetting mail fraud on the following grounds: (1) the government presented four different interpretations of the "direct supervision" requirement to the jury; (2) the evidence presented at trial, at best, established that he had only "improper" billing practices; (3) the government failed to prove that the psychotherapy services for which he billed the federal entities, private insurers, and individuals had not been actually provided by his therapists; and, thus, (4) without a showing of such loss from the purported fraud, the government has failed to meet its burden of proof of a reasonable doubt.

Bulger's first argument is that the government failed to establish that she placed any of the fraudulent insurance claims underlying the twenty-two counts of mail fraud and aiding and abetting mail fraud in the United States mail. Bulger similarly contends that there exists no evidence that she entered, or caused the billing information to be entered on any of the claims. Therefore, citing United States v. Ragan, 24 F.3d 657 (5th Cir. 1994), Bulger argues that the government failed to "link" her to the indictment transactions, and, thus, each of her mail fraud convictions should be reversed.

To establish a violation of the federal mail fraud statutes, 18 U.S.C. §§ 1341 and 2, the government must prove: (1) a scheme to defraud; (2) the use of mails to execute that scheme; and (3) the defendant's specific intent to commit fraud. United States v. Tencer, 107 F.3d 1120, 1125 (5th Cir. 1997), cert. denied, 118 S.Ct. 390 (1997) (citations omitted). A conviction for aiding and abetting mail fraud must be corroborated with sufficient proof that the defendants: (1) voluntarily associated with the criminal enterprise; (2) voluntarily participated in the venture; and (3) sought by independent action to make the venture succeed. Sidhu, 130 F.3d at 650 (citations omitted).

B

(1)

Viewing the evidence in the light most favorable to the jury's verdict, as we must, Sidhu, 130 F.3d at 648, we hold that the government met its burden of establishing each of the defendants' guilt beyond a reasonable doubt. The superceding indictment alleged that from 1985 until January 7, 1997, Bonham and Bulger knowingly devised and participated in a scheme to submit false and fraudulent insurance claims to Medicare, Medicaid, CHAMPUS, private insurers, and individuals. The theory of the government's case was that the defendants systemically billed the federally funded health care programs, private insurers, and individuals for psychotherapy and related medical services that were not personally provided by

Bonham, not provided under his "direct personal supervision," nor provided "incident to" a medical service rendered by him, as required by the applicable federal regulations. The government further charged that Bonham, with Bulger's assistance, filed the insurance claims under his name and provider number, deliberately using CPT codes that affirmatively misrepresented that he had personally provided the psychiatric care for which he sought payment. If rendered at all, the medical services were rendered by Bonham's nurses and therapists--employees for whose work Bonham was not lawfully entitled to be reimbursed. Even still, the defendants' submitted fraudulent claims for medical services that the therapists and nurses had not provided, or had not provided in the manner or length of time billed.

(2)

We are satisfied that through the testimony of Bonham's former billing clerks,[9] therapists,[10] nurses,[11] and patients,[12] the government

_____

[9] Jennifer Joergensen testified that daily, Bulger created hospital charge sheets, which listed the names of Bonham's patients, where they were hospitalized, the dates of their hospitalization, and the charges to be posted to their accounts. Joergensen stated that notwithstanding the medical care the patients actually received, Bulger charged each patient for the same "set" of standardized services: physician's rounds, stress reduction therapy, individual psychotherapy, and group psychotherapy. To create the charge sheets, Bulger used an office-generated patient list, which only identified the patients by name. She made no attempt to verify the true nature of the patient's psychiatric care, or if patients had been treated by therapists instead of Bonham. Bulger then gave the completed charge sheets to Joergenson, and instructed her to bill the patients accordingly. Joergenson testified that these "charges" were, in turn, used to generate the insurance claims mailed to Medicaid, Medicare, CHAMPUS, the private insurers, and individuals. Next, Kelly Bridges, one of Bonham's former receptionists, similarly testified that under direct orders from Bulger, she routinely charged each patient for the same cluster of psychiatric services. Finally, consistent with Joergenson and Bridges's testimony, Renee Husky, testified that Bulger provided her nursing home charge sheets, and instructed her to bill Bonham's nursing home patients in a cookie-cutter fashion. Husky also stated that Bulger never provided her any proof of whether Bonham or his therapists had actually treated the patients as billed. Husky further testified that Bulger instructed her to use particular codes to update the patients' accounts--CPT billing codes 90801 and 90843. Husky stated that she never knew, however, what information the codes communicated to the

13

insurance companies.

[10]Georgia Williams testified that for the year she worked as a therapist for Bonham, from August 1991 until September 1992, she was not a licensed psychotherapist, and did not become one until after she left Bonham's employment. Notwithstanding, Williams stated that her job responsibilities included providing 45 minutes of daily psychotherapy to 15 or 20 geriatric patients daily. Williams further testified that during the year of her employment, she never saw Bonham personally provide psychotherapy to his patients. Williams also testified that Bonham directed her to complete daily, false progress notes on his geriatric patients. Thus, for six months, Williams charted events in the patients' files that had not occurred, and listed medical systems that the patients did not have. Williams also documented that the geriatric patients received 45 minutes of psychotherapy, although, because of her heavy patient load, she spent only two to five minutes with the patients. Finally, Williams testified that Bulger instructed her to tell the patients that Bonham was "out on an emergency" when they inquired about his absence.

A second therapist, Carrie Gasparovic, testified that she complied with Bulger's instructions to falsely chart that she conducted 30-minute psychotherapy sessions with Bonham's adolescent patients who were hospitalized at CPC Oak Bend Hospital. Gasparovic further stated that, in any event, she never conducted 45- to 50-minute individual psychotherapy sessions with the patients--a time period for which the patients were customarily billed. Further, when the government questioned her if she had been instructed to spend less time with the patients, Gasparovic responded that it was "something" about the Medicaid patients; "we didn't need to spend as much time with them." Gasparovic also testified that for a ten dollar bonus, she conducted Bonham's physician's rounds on weekends.

Finally, Mary Elizabeth Costas testified that Bonham was never present when she provided psychotherapy to his patients in the Huguley Hospital. Similar to Williams, however, Costas was not a licensed psychotherapist in March of 1993, when first hired by Bonham. Costas testified that when she expressed to Bonham that his patients had become disenchanted because they were being treating by therapists, Bonham responded that he was no longer seeing patients for individual psychotherapy.

[11]Carrie Crawford worked for Bonham as a licensed vocational nurse, starting in August of 1992. Crawford testified that she and second nurse, Lynn Hibben, customarily conducted the psychiatric evaluations of Bonham's nursing home patients. Using a book of

14

diagnostic codes compiled by Bonham, Crawford would randomly dictate codes for each patient. Crawford testified that Bonham told her which codes to dictate when conducting the evaluations, and, thus, it only took five to ten minutes to complete the evaluations. The trial evidence further established that Bonham would bill the medical insurers for psychiatric evaluations conducted by the nurses. In doing so, Bonham would falsely certify that he personally spent 70 minutes at the patients' bedside.

Margaret Escamilla gave a similar account of her work experience with Bonham. Escamilla testified that for approximately two and one half months, starting in July 1992, she worked part-time as a psychiatric nurse for Bonham, and conducted psychiatric evaluations of Bonham's nursing home patients. Escamilla was still in college at the time, however, and had not obtained a degree. Escamilla stated that although she was not qualified to conduct the evaluations, Bonham never accompanied her to the nursing homes. Bonham instead trained her to complete the nursing evaluations using an outline, and his book of diagnosis codes. Escamilla further testified that Bonham did not follow up on the nursing home patients as he represented he would and that, unbeknownst to her, he had billed Medicare for the psychiatric evaluations she had completed.

[12]From March 1998 until June 1998, Robin Wester was hospitalized at the Psychiatric Institute of Forth Worth and Medical Plaza hospital. Wester stated that during that entire period, Bonham never provided her the 60 minutes of individual psychotherapy, nor the 60 minutes of family psychotherapy, for which he billed her father's insurer, Aetna. Regarding a 30-minute medicine check for which Bonham billed Aetna, Wester stated that Bonham never treated her for that period of time. Moreover, the group psychotherapy sessions Wester attended were always conducted by therapists. Wester clarified, however, that the time she spent with the therapists was "usually very brief." Wester's father also testified that the three family psychotherapy sessions that he attended with his daughter were each conducted by Bonham's therapists. Bonham, however, billed Aetna as if he had personally conducted the sessions.

Amy Lynn Kelty-Jacobs testified that during her stay at the Psychiatric Institute of Forth Worth from November 12, 1991 until December of 1991, she only saw Bonham for three or four times, in increments of only 5 or 10 minutes. Kelty-Jacobs further testified that Bonham never provided her the 30 nor 45 to 50 minutes of individual psychotherapy for which he billed CHAMPUS. Finally, Kelty-Jacobs stated that her medical charts included false information--diagnoses for prescriptions that she had never taken, and entries that falsely represented that she had been treated by

15

established the existence of the mail fraud scheme beyond a reasonable doubt.

(3)

The numerous incidents of phantom billing also provided some evidence from which the jury could have reasonably inferred the defendants' guilt.  On Sunday, November 24, 1991, 38 of Bonham's patients were collectively billed $7,150 in psychiatric treatment,

although Bonham was not scheduled to treat patients that day. Next, on November 25, 1991, 70 of Bonham's clinical patients were charged for diagnostic psychiatric interviews and 45-minute psychotherapy sessions.  The total amount billed was $13,363.00. Again, there existed no proof, i.e., patients' files, physician's notes, that the services were actually rendered.  The testimony of

---

Bonham for several consecutive days in one week, several weeks in a row.

Leesa Jo Pavelka similarly testified that during her hospitalization at CPC Oak Bend Hospital from October 5, 1992 until November 21, 1992, she hardly saw Bonham; maybe two or three times. Pavelka had no recollection of attending the 20- nor 30-minute individual psychotherapy sessions with Bonham, for which he billed Medicaid.

Kerri Springfield also denied receiving the psychiatric care for which she and CHAMPUS were subsequently billed.  Springfield testified that during her three hospitalizations in the Medical Plaza Hospital and the Huguley Hospital in 1991 and 1992, Bonham never conducted fifteen weekly individual psychotherapy sessions with her, and never made physician's rounds to see her.  At best, Springfield saw Bonham once a week for fifteen minutes.  She had daily encounters with his therapists, however.  On September 14, 1992, however, Bonham sent Springfield a bill totaling $6,689.31. The invoice also showed that a claim for charges in excess of $83,000 had been submitted to CHAMPUS.

Penny Schmidt offered a similar account of her psychiatric treatment under Bonham's care from February 19, 1992 to March 6, 1992.  Schmidt was also a patient at Psychiatric Institute of Fort Worth.  Schmidt testified that she saw Bonham maybe once or twice walking down the hall, and that he never provided her the biofeedback, medication checks, individual psychotherapy, and group psychotherapy as listed in the CHAMPUS insurance claim.  Schmidt also stated that Bonham had not personally treated her as represented in the physician's notes included in her patient file. Smith instead testified that the individual and group psychotherapy sessions she attended were conducted by Georgia Williams, Bonham's therapist.

16

the government's witnesses made clear, however, that notwithstanding how Bulger manipulated Bonham's appointment books by varying the amount of time a patient would be seen, Bonham, nor his therapists could have treated that number of patients in one working day, and certainly could not have provided them 45 minutes of psychotherapy.  Finally, on Thanksgiving Day, in 1991, Bonham vacationed in Cancun, Mexico.  Although he admitted at trial that he treated no patients this day, 20 of his patients were collectively charged $3,244 for individual psychotherapy sessions allegedly conducted by him.

(4)

We next note that the government presented evidence to corroborate each of the twenty-two substantive counts of mail fraud.  To establish that Bonham did not personally render the

medical services underlying each of the twenty-two counts of mail fraud and aiding and abetting mail fraud, the government presented proof, and, indeed, Bonham admitted on cross-examination, that he was actually out of town on particular dates that he was alleged to have treated his patients.[13]  Additionally, for each of the twenty-two counts, the government introduced: (1) the HCFA 1500 claim form that Bonham submitted to Medicare, Medicaid, CHAMPUS, and the private insurance companies; (2) the copies of the canceled checks remitted to Bonham in payment on the claims; and (3) status reports that itemized the psychiatric services that Bonham alleged to have provided his patients, the CPT codes Bonham and Bulger used to make these representations, and the benefits paid by the insuring entities.

Finally, representatives from Medicare, Medicaid, and CHAMPUS all testified that under the federal regulations applicable to each of the twenty-two counts, Bonham and Bulger's method of billing was unlawful.

(5)

---

[13]With respect to counts five and six, the evidence presented at trial established that Bonham was in Washington, D.C., from April 23-24, 1992.  Likewise for counts seven, eight, and nine, Bonham was in Tucson, Arizona, from November 5-7, 1992.  Next, from February 17-19, 1993, the dates relative to counts ten, eleven, twelve, and thirteen, Bonham vacationed in Albuquerque, New Mexico. For the remaining counts of mail fraud (counts fourteen through twenty-two), for the period of March 16-19, 1993, Bonham was in Cancun, Mexico.

17

Barbara Harvey,[14] the Medicare representative, testified to the Medicare regulations, as applied to mail fraud counts 1-2, 5-8, 10-11, 15-16, 18, 20-22. Harvey explained that when a physician submits a claim to Medicare on the HCFA 1500 form, the physician, vis-à-vis his signature on the form, has certified that he either personally provided the medical services for which the Medicare claim was submitted, or that he directly supervised the performance of that service by one of his employees. Harvey also testified that a physician's (Bonham's) use of the CPT codes 90843 and 90844 on the HCFA 1500 form constituted an affirmative representation that he personally spent the time indicated in the code treating the patient. Harvey explained, however, that under the Medicare regulations, a physician--in this case, Bonham--could not "personally provide" psychotherapy to a patient from a telephone in Cancun, Mexico; nor could Bonham, from Mexico, "directly supervise" psychotherapy sessions being conducted by therapists back in his Texas clinics.

The defendants attempted to respond to this damaging testimony, by asking Harvey a series of questions on cross-examination as to whether Medicare permitted Bonham to bill for services performed by his therapists or other employees. Harvey responded affirmatively in each instance but, in doing so, explicitly emphasized that Bonham was nonetheless required to abide by Medicare's billing regulations, i.e., that he personally provide the services billed or that he meet the direct supervision requirement, or the incidental services requirement. Harvey further testified that with the exception of certain exclusions under the guidelines not applicable here, the direct supervision requirement must be met with respect to every service provided by a non-physician.

Harvey next testified that to bill Medicare for services provided "incident to" a physician's services, the physician was not required to be present in the room with the patient. Instead, Medicare regulations only required the physician (Bonham) to be present in the office suite when his employees provided the "incidental" services. Harvey clarified, however, that the only medical service she could qualify as being provided "incident to" psychotherapy would be an injection given to the patient by the physician's employee. In response to a hypothetical question posed by defense counsel, Harvey expounded even further on this concept: an injection provided by a nurse is not provided "incident to" a physician's services if the physician is out of the office when the

_____

[14]Harvey is the director of customer support for the Medicare division of Blue Cross and Blue Shield of Texas. Blue Cross and Blue Shield administers the Medicare program in the state of Texas.

18

nurse administers the shot, and, thus, the physician would not be authorized to bill Medicare for the injection.

Next, Mary Ann Wallace[15] interpreted the Medicaid regulations, as applied to counts 9, 12, 13, 14, 17, and 19. Wallace stated that for the purposes of billing Medicaid for a physician's medical services, a physician was required to be physically present to treat the patient. Wallace likewise testified that to lawfully be reimbursed from Medicaid for psychotherapy billed under psychiatric CPT code 90943, the physician (Bonham) must have personally provided the psychotherapy. Wallace further clarified that for the purposes of billing Medicaid under code 90843, a physician is permitted to have a staff person assist him during the psychiatric session, but the physician, nonetheless, must be physically present in the room, actually treating the patient. A physician, therefore, is not permitted to bill Medicaid under CPT code 90843 for psychotherapy provided by either a licensed vocational or registered nurse. Wallace did testify that under the Medicaid guidelines a physician could arrange for "cover"––to have another accredited, licensed physician to provide psychotherapy to his patients during his short-term absence. The absent physician was required to indicate on the claim form that some other doctor treated the patient. Wallace stated that Bonham made no such representations in his Medicare claim forms.

Finally, Ruth Smith,[16] interpreted the CHAMPUS regulations, and testified to count three. Smith testified that CHAMPUS only pays the claims for services of those health care professionals, i.e., physicians, therapists, and nurses, who are listed as "authorized providers" under the CHAMPUS program.[17] CHAMPUS also permits physicians to personally bill for medical services rendered by their therapists, provided that the therapists themselves are

_____

[15]Wallace is the manager of the professional claims services area of NHIC with Medicaid.

[16]Smith is a program integrity specialist with the office of CHAMPUS in Aurora, Colorado.

[17]To become an authorized provider, an individual must complete a CHAMPUS application, which certifies, inter alia, his professional credentials, and that he is licensed to practice in his state. Indeed, physicians, physician's assistants and therapists are required to be certified and licensed in the state in which they practice to participate in the CHAMPUS program. Once a physician or therapist becomes authorized under CHAMPUS, for billing purposes, the physician or therapist is given a provider number, which is generally the same as his tax identification or social security number. [10 R 156].

19

authorized to treat patients under the program. In such instances, the physician is required to indicate on the HCFA 1500 form that his therapists, not he, actually provided the medical services billed. Smith further testified that the claim form expressly instructs the physician to indicate therein if "other providers" have treated the patient. Smith testified, however, that according to CHAMPUS records, none of Bonham's nine therapists were identified as authorized providers under the program. Smith then stated that if Bonham, consistent with CHAMPUS regulations, had indicated on the CHAMPUS claim form that his therapists had actually provided the psychotherapy session underlying count 3, the claims would not have been honored. Smith similarly testified that if Bonham had indicated to CHAMPUS that he was in New Mexico on February 18, 1993, rather than his office suite, CHAMPUS would have denied the claims for psychotherapy that Bonham alleged he provided that day. The only service Smith could phantom as being rendered "incident to" individual psychotherapy provided by Bonham would be a nurse escorting a patient into the room. Smith's testimony on this point is telling.

Indeed, we are of the view that this record literally speaks volumes with respect to Bonham and Bulger's guilt, which fully supports the jury's verdict. In choosing among reasonable constructions of this evidence, the jury properly rejected the defendants' theory of the case--that the psychiatric services for which they billed Medicare, Medicaid, and CHAMPUS were, at all times, provided under Bonham's direct personal supervision, and that a licensed physician treated Bonham's patients in his absence. Similarly, the jury reasonably could have found implausible Bonham's self-serving, and uncorroborated testimony that he honestly believed it was permissible to bill Medicaid, Medicare, and CHAMPUS at a physician's rate for the work of his nurses and therapists, and that he contacted the federal agencies, who in turn, verified the accuracy of his billing procedures.

(6)

Furthermore, we find that neither defendant has weakened the strength of the evidence of their guilt by their arguments on appeal. First, in arguing that the government presented varying interpretations of the direct supervision requirement, Bonham has distorted the nature and content of the testimony of Smith, Roberta Stellman, and Dr. Myron F. Weiner. Smith testified only to the general billing requirements applicable to CHAMPUS and, in doing so, offered no interpretation of the "direct supervision" requirement. The testimony that Bonham cites in support of his argument otherwise only reinforces our conclusion here. We are likewise convinced that Dr. Stellman testified to issues regarding "cover" and medical services provided "incident to" a physician's treatment of a patient. These concepts, while relative, are

20

nonetheless quite different from notion of "direct supervision," a distinction that Bonham has attempted to blur.

Weiner did state, however, as Bonham argues on appeal, that "direct supervision" by a physician means that "the person does it under your control–not always under your observation, but certainly reports very directly to you." Notwithstanding, consistent with our obligation to attribute all reasonable inferences from the testimony in favor of the jury's judgment of conviction, our task here is not to view this statement in isolation, but in conjunction with the whole of Weiner's testimony. In doing so, we find that Weiner's interpretation of "direct supervision" is entirely consistent with Harvey's earlier testimony that Bonham could not provide direct supervision to his therapists while he vacationed outside of Texas, specifically, in Cancun, Mexico. In response to a hypothetical question on the issue, Weiner testified that the "direct supervision" requirement was not met where the physician's (Bonham's) nurse conducts psychiatric evaluations of nursing home patients while he is out of the state--circumstances identical to the facts of this appeal. Weiner further explained that the absent physician should not submit a claim for a nurse's evaluation, misrepresenting it as his own; to do so would be to charge the insurer for psychiatric care that the physician did not provide. Thus, after viewing Weiner's testimony in its proper light, we cannot say that the government presented inconsistent interpretations of the "direct supervision" requirement to the jury. Bonham, in parsing the above isolated statement from Wallace's testimony, has attempted to manufacture a discrepancy in the record that does not exist.

Second, in the light of the testimony of Bonham's former employees and patients, as informed by the testimony of the Medicare, Medicaid, and CHAMPUS representatives, Bonham's argument that he only had improper, rather than unlawful, billing practices is frivolous. The law in this circuit is entirely consistent with the Second Circuit's explicit pronouncement that a physician's deliberately misleading use of a particular billing code in claims submitted to Medicare supports criminal fraud charges under 18 U.S.C. § 1341 and 18 U.S.C. 287. Cf. Siddiqi, 98 F.3d at 1428 to Sidhu, 130 F.3d at 647-49.

Finally, Bonham's assertion that his therapists fully provided the medical services for which he billed--an argument, we add, not supported by the evidence--does nothing to undermine the overwhelming case against him. The truly relevant considerations underlying Bonham's convictions are not what services his therapists allegedly provided, but what medical services Congress through its legislation, and the agencies through implementing regulations, intended to pay for under Medicare, Medicaid, and CHAMPUS. Notably, the testimony of the representatives of federal agencies was entirely consistent on this point: the government

21

would not have knowingly compensated Bonham at the much higher fee schedule applicable only to physician's services for the psychiatric treatment purportedly provided by his therapists. This testimony, which stands uncontested on the record before us, disposes of Bonham's final argument--that the government failed to show loss from the fraud.

(7)

Bulger argues that there exists no evidence that she actually placed any of insurance claims underlying the 22 counts of mail fraud in the United States mail. Even if we assume her statement to be true, this fact does not warrant the reversal of her convictions. To sustain a § 1341 or § 1342 mail fraud conviction the government need not establish that the defendant personally sent the offending articles through the mail. United States v. Manges, 110 F.3d 1162, 1169 (5th Cir. 1997), cert. denied, 118 S.Ct. 1675 (1998). Where, as here, the mailing of the insurance claims was an essential part of the defendants' scheme, it is sufficient if the claims were sent either by a victim of the scheme, or an innocent third party Manges, 110 F.3d at 1169 (internal citations and quotations omitted). Bulger concedes in her brief that several of Bonham's unindicted employees were responsible for mailing the HCFA 1500 forms on which the fraudulent insurance claims were submitted. This concession is fatal to her appeal. These individuals qualify as "innocent third parties" as contemplated by Manges.

Ragan does also nothing to advance Bulger's position. In Ragan, 24 F.3d at 659, the government conceded that the defendant never personally entered the information on the fictitious trade tickets underlying his convictions for eighteen counts of mail fraud. Therefore, to sustain the convictions, we held that the government had the burden of proving that the defendant was so involved with the information being placed onto the trade tickets by the third party that reasonable and fair-minded men would agree that the defendant "caused" the fraudulent information to be to be transmitted through the mail. Id. (citing United States v. Vontsteen, 872 F.2d 626, 628 (5th Cir. 1989). In United States v. Humphrey, 104 F.3d 65, 70 (5th Cir. 1997), cert. denied, 520 U.S. 1235 (1997) (citations omitted), we further expounded on this premise. We explained that if a defendant acts "with the knowledge that the use of the United States mail would follow in the ordinary course, or that the use of the mail was reasonably foreseeable," then she has "caused" an article to enter the United States mail for the purposes of § 1341. Id.

Applying Ragan, as informed by Humphrey, we find there exists sufficient proof that Bulger "caused" the fraudulent insurance claims to be placed in the mail. It is without dispute that the placement of the HCFA 1500 form in the mail provided the sole means by which the defendants submitted, as well as recouped payment on

the fraudulent insurance claims. Thus, from the evidence that Bulger instructed Bonham's staff to bill the nursing home patients' using a specific CPT code, and that she routinely charged each patient for a "set" of psychiatric services--information she later instructed the staff to transferred to the HCFA 1550 forms--we find that Bulger acted with the requisite knowledge of a very foreseeable, if not an obvious fact--the mailing of the HCFA 1500 form would follow in the ordinary course of the scheme.

(8)

In sum, the evidence supporting the jury's verdict is overwhelming. Bonham and Bulger's convictions on the twenty-two counts of mail fraud and aiding and abetting mail fraud are therefore affirmed.

IV
A

Bonham and Bulger next argue that the sufficiency of the evidence fails to support their conviction on count 26, conspiring to commit mail fraud and to submit a false claim to a federal governmental agency. The ultimate points of contention between the government and the defendants are: (1) whether the government met its burden of establishing the existence of the conspiratorial agreement; and (2) whether the defendants committed any overt acts in furtherance of the agreement.

B

To establish the existence of a mail fraud and false claims conspiracy the government must establish beyond a reasonable doubt: (1) an agreement between two or more persons; (2) to commit these crimes; and (3) an overt act committed by one of the conspirators in furtherance of the agreement. Id. at 681-82.

Resolving all inferences and credibility determinations from the evidence in favor of the government, we hold that Bonham and Bulger's concert of action in actively submitting false and fraudulent claims to Medicaid, Medicare, and CHAMPUS provided circumstantial evidence from which the jury reasonably found the existence of the mail fraud and false claim conspiracy. See Sidhu, 130 F.3d at 648.

Next, we need only to refer to much of the ground previously covered in this appeal to hold that the government met its burden of showing at least one of the co-conspirator's took an act in furtherance of the conspiracy. See Sidhu, 130 at 658. Bonham acted complicitly in the mail fraud and false claim conspiracy when he deliberately misused the CPT codes to misrepresent the nature of the psychiatric services provided his patients, the duration of such services, and the fact that he never treated the patients. Bonham also instructed his employees to falsify information contained in the patients' progress notes, and the actual length of the psychotherapy sessions they conducted. Moreover, although

23

further proof is unnecessary to sustain the defendants' convictions, see Sidhu, 130 F.3d at 649, (co-conspirator liable for reasonable foreseeable acts of her cohort), we further note that Bulger acted in furtherance of the conspiracy when she instructed the office staff to add bogus charges to the patients' accounts. Bulger also scheduled patients for 20-minute psychotherapy sessions, which she later billed as 45-minute sessions. To be sure, this case bears an uncanny resemblance the conspiracy for which the defendant psychiatrist and his office manager were convicted of in Sidhu, 130 F.3d at 647-50. Thus, we need not dwell on this issue further. We affirm Bonham and Bulger's conspiracy conviction on count 26.

V

A

In his final argument on appeal Bonham challenges the sufficiency of the evidence supporting his conviction for one count of submitting a false claim to a federal governmental agency and aiding and abetting the submission of a false claim. Bonham presses the same arguments here as he did in challenging his convictions for the twenty-two counts of mail fraud.

B

To sustain Bonham's conviction for filing a false claim under 18 U.S.C. § 287, the government must prove that: (1) a false or fraudulent claim was presented against the United States; (2) the claim was presented to a governmental agency; and (3) the defendant knew that the claim was false. Upton, 91 F.3d at 681. Bonham's conviction for aiding and abetting the submission of a false claim must be supported with sufficient evidence that Bonham: (1) voluntarily associated with the criminal enterprise; (2) voluntarily participated in the venture; and (3) sought by independent action to make the venture succeed. See Sidhu, 130 F.3d at 650 (citations omitted) (aiding and abetting mail fraud).

We are satisfied that the government presented evidence sufficient to meet its burden of proof on each of the essential elements of these crimes beyond a reasonable doubt. Count 24 of the superceding indictment alleged that Bonham knowingly and willfully submitted a false and fraudulent claim to CHAMPUS, an agency of the United States, for medical services purportedly provided to Georgia Malyszka. The evidence presented at trial established that on February 25, 1993, Bonham filed a $1,375 claim with CHAMPUS for psychiatric and related medical services that he purportedly provided Malyszka from February 14-20, 1993. On April 7, 1993, CHAMPUS paid Bonham $366 on the claim. The record shows, and Bonham concedes, however, that he did not personally provide the medical services claimed for the dates of February 17-19, 1993, as he was in Albuquerque, New Mexico. Smith, the CHAMPUS representative, testified that if the government had known

24

that Bonham was out of the state from February 14-20, 1993, the government would have denied the claim as false.

Regarding the remaining dates listed in the CHAMPUS claim, Malyszka testified that she was never treated by Bonham during her February 1993, stay at the CPC Oak Bend Hospital. Malyszka stated that she instead met with Betty Spainhour daily, one of Bonham's therapists. Bonham's appointment book supports this testimony. The appointment book showed that Malyszka was scheduled for 45-minute psychotherapy sessions with Spainhour on the 15, 16, 18, and 19 of February 1993. Malyszka was paired with a second therapist on February 17, 1993. Neither one of these therapists were listed as authorized providers under the CHAMPUS program, however. Bonham, therefore, was not lawfully entitled to be reimbursed for psychotherapy they purportedly provided. Significantly, Malyszka further testified that even her psychotherapy sessions with Spainhour only lasted five to ten minutes, and that the multiple 45-minute individual psychotherapy sessions, the family psychotherapy sessions, and the psychiatric diagnostic interview, for which CHAMPUS reimbursed Bonham, never occurred. Malyszka explained that prior to Bonham's trial, she had neither met nor spoken to the physician. Incriminatingly, Malyszka's patient file contained progress notes signed by Bonham, which falsely represented that he conducted the 45-minute psychotherapy sessions for which he billed CHAMPUS.

In the light of the record before us, we are fully satisfied that the jury properly rejected as untenable Bonham's testimony that he properly complied with the CHAMPUS regulations in submitting this claim. We therefore affirm Bonham's false claim conviction.

## VI

For the aforementioned reasons, we AFFIRM each of the defendants' convictions and their respective sentences on all counts.

A F F I R M E D.

25